**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

TAYLOR CORPORATON,

　　　　　　　　　　　　　　　　　　　　Civil No. 22-1151 (JRT/TNL)

　　　　　　　　Plaintiff,

v.

XL INSURANCE AMERICA, INC.,
WESTPORT INSURANCE CORP., and
LIBERTY MUTUAL FIRE INSURANCE CO.,

**MEMORANDUM OPINION AND ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY**

　　　　　　　　Defendants.

---

Amran Farah, Gina Tonn, Jeanette M. Bazis, Mark L. Johnson, and Sybil L. Dunlop, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN 55402, for Plaintiff.

Daniel J. Millea and Laura W. Bartlow, **ZELLE LLP**, 500 Washington Avenue South, Suite 4000, Minneapolis, MN 55415, for Defendants.

Plaintiff Taylor Corporation ("Taylor")[1] discovered that concrete press pads at its leased printing facility were damaged and unusable. After consulting with engineering firms, Taylor replaced its press pads with an upgraded design, but only after a delay of several months. Taylor then sought coverage for its losses under identical insurance policies issued by Defendants XL Insurance America, Inc., Westport Insurance Corporation, and Liberty Mutual Fire Insurance Company (collectively "Insurers"), which

---

[1] The Court refers to Taylor and its subsidiary, Curtis 1000, collectively as "Taylor" herein.

Insurers denied.  Taylor subsequently filed this action, asking for a declaratory judgment that Insurers pay out Taylor's claims.

Now that fact discovery has closed, Taylor moves for summary judgment on liability, while Insurers move for summary judgment on liability or alternatively to limit the scope of damages.  Because the evidence now shows that earth movement caused Taylor's damages, the Court will grant Taylor's motion and grant in part and deny in part Insurers' motion.  The Parties also move to exclude the testimony of each other's damages experts.  Because the experts use reliable methods and their opinions will help the jury calculate damages, the Court will deny those motions, except that those experts must now revise their reports to comport with the contours of this Order.

## BACKGROUND

### I.    FACTS

Curtis 1000, Taylor's subsidiary, contracted with a developer to lease a "build-to-suit" printing facility in Fridley, Minnesota (the "Fridley Facility").  (Decl. of Gina M. Tonn ("Tonn Decl.") Ex. 1, Aug. 9, 2023, Docket No. 74.)  The Fridley Facility was built with several specially reinforced, isolated equipment pads meant to support integral printing press equipment ("Press Pads").  (*Id.* at Ex. C.)

Taylor attempted to install a Heidelberg press on one of the Press Pads in January 2019 but was unable to because the Press Pad had moved, preventing the Heidelberg press from being level.  (Decl. of Janine R. Matzke ("Matzke Decl.") ¶ 2, Aug. 9, 2023, Docket No. 76.)  Using Heidelberg presses on unlevel press pads would prevent the

presses from functioning properly and likely cause substantial damage. (*Id.* ¶ 3.) Taylor hired a geo-technical engineering firm to analyze the issue, which concluded that the soil beneath the Fridley Facility was "not suitable for support of the printing press foundations." (Decl. of Bill Conrad ("Conrad Decl.") Ex. 3, at 10, July 5, 2023, Docket No. 58-3.) Consequently, Taylor could not install the Heidelberg presses at the Fridley Facility, which caused delays in its planned consolidation of its operations from three Twin Cities locations into the new Fridley facility, triggering excess expenses and costs. (Matzke Decl. ¶¶ 4–5.)

After taking time to evaluate its options, Taylor eventually determined it was necessary to tear out all six Press Pads and start over. (Decl. of Laura Bartlow ("Bartlow Decl."), Ex. 5 ("Jackson Dep.") at 26:14–16, 52:5–12, July 1, 2024, Docket No. 122-2.) Rather than reinstall identical press pads that it believed would simply fail again, Taylor opted for a significantly more expensive design that drilled deeper into the earth to stabilize the new, thicker press pads. (*Id.* at 26:3–27:25.)

Taylor sought to recover damages caused by the Press Pad failure under identical insurance policies (the "Policy") issued by Insurers. (Conrad Decl. ¶ 5.) Insurers denied Taylor's claim in October 2019. (*Id.* ¶ 10, Ex. 5 at 2–3.) Taylor requested that Insurers reconsider, but Insurers refused. (Tonn Decl. ¶ 2, Ex. 9 at 2; Conrad Decl. ¶ 11, Ex. 6 at 2.)

## II.    PROCEDURAL HISTORY

Taylor filed this insurance coverage action on May 2, 2022.  (*See* Compl., Docket No. 1.)  The Parties originally cross moved for partial summary judgment on the purely legal question of whether earth movement caused in part by faulty workmanship and/or settling would be covered by the Policies' earth movement coverage extension, or if it would be excluded under the Policies' faulty workmanship and settling exclusions.  (*See* Pl.'s 1st Mot. Summ. J., Nov. 1, 2022, Docket No. 25; Defs.' 1st Mot. Summ. J., Dec. 1, 2022, Docket No. 36.)  Because it found that the Policy's language was ambiguous, the Court denied Insurers' motion and granted Taylor's.  *Taylor Corp. v. XL Ins. Am., Inc.*, No. 22-1151, 2023 WL 4595708 (D. Minn. July 18, 2023).

While the cross motions were pending, Insurers filed a second motion for summary judgment, arguing Taylor should not be able to recover because Taylor extinguished Insurers' subrogation rights in violation of the insurance Policy and because Taylor should be equitably estopped from recovering against Insurers.  (Defs.' 2nd Mot. Summ. J., July 5, 2023, Docket No. 55.)  The Court denied that motion and dismissed sua sponte Taylor's affirmative defense of equitable estoppel.  *Taylor Corp. v. XL Ins. Am., Inc.*, No. 22-1151, 2024 WL 453826 (D. Minn. Feb. 6, 2024).

In yet another round of motions, the Parties filed the instant cross motions for summary judgment to decide the question of liability and to limit the scope of damages. (Pl.'s 2nd Mot. Summ. J., July 1, 2024, Docket No. 111; Defs.' 3rd Mot. Summ. J., July 1, 2024, Docket No. 119.)  Simultaneously, each party also filed a *Daubert* motion to exclude

the opinions and testimony of the other's primary damages expert.  (Pl.'s Mot. Exclude

Expert Test., July 1, 2024, Docket No. 102; Defs.' Mot. Exclude Expert Test., July 1, 2024,

Docket No. 133.)

## DISCUSSION

## I.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material

fact, and the moving party can demonstrate that it is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and

a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a

verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court considering a motion for summary judgment must view the facts in the light most

favorable to the nonmoving party and give that party the benefit of all reasonable

inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or

denials but must show, through the presentation of admissible evidence, that specific

facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R.

Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably

find for the plaintiff."  *Id.* at 252.

**B.      Motions to Exclude Expert Testimony**

Federal Rule of Evidence 702 governs the admissibility of expert testimony and

provides the following:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of
> an opinion or otherwise if the proponent demonstrates to the
> court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and
> methods; and
> (d) the expert has reliably applied the principles and methods
> to the facts of the case.

Fed. R. Evid. 702.  In essence, there are three prerequisites to admitting expert testimony:

(1) the evidence is relevant and helpful for the trier of fact, (2) the proposed witness is

qualified to assist the trier of fact, and (3) the proposed evidence is reliable.  *Lauzon v.*

*Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  For evidence to be reliable, it must

be based upon sufficient facts or data and be a product of reliable principles and methods,

and the witness must have applied the principles and methods reliably to the facts of the

case.  *Id.*

The district court has a gatekeeping obligation to make certain that all testimony

admitted under Rule 702 satisfies these prerequisites and that "any and all scientific

testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell*

*Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of the expert testimony has

the burden of establishing by a preponderance of the evidence that the expert is qualified, that his or her methodology is scientifically valid, and that "the reasoning or methodology in question is applied properly to the facts in issue." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006).  Expert testimony is inadmissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.* at 757.

The trial judge has wide discretion in deciding whether expert testimony is reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  However, doubts should be decided in favor of admissibility. *Marmo*, 457 F.3d at 758.  "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988).  "Only if [an] expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).

## II.    MOTIONS FOR SUMMARY JUDGMENT

Taylor and Insurers have filed cross motions for summary judgment, and their issues overlap.  Taylor moves for summary judgment on the narrow question of liability, asking the Court to find that Insurers are liable under the Policy because Taylor's losses resulted from earth movement.  Insurers move for summary judgment on six different issues, and because their motions cover the same issues raised by Taylor and more, the Court will analyze each of the Insurers' motions in turn.

### A.    Earth Movement & Settlement as a Policy Exclusion

The Parties disagree on whether earth movement was a contributing cause of Taylor's losses and whether damage from settlement is excluded from the Policy. Insurers argue that there has been no earth movement as described in the Policy and that, regardless, the Settlement exclusion prohibits any recovery here. The Court has already decided both issues in favor of Taylor.

In the first round of motions for summary judgment, the Court considered arguments that the settlement language meant that damage caused by settlement was excluded from the Policy. Ultimately, the Court held that "[e]arth movement caused by faulty workmanship and/or settling is covered by the Policies' earth movement coverage extension, regardless of [whether] the faulty workmanship and/or settling is the proximate cause of the loss." *Taylor Corp.*, 2023 WL 4595708, at *8.

Insurers now attempt to relitigate this issue, arguing that even if there was settlement under the Press Pads, that does not constitute earth movement. But because the Court has already definitively held otherwise, the Court will deny Insurers' motion as to these issues.

On the other hand, Taylor moves the opposite, asking the Court to find that the Insurers are indisputably liable under the Policy because Insurers do not truly contest that earth movement caused Taylor's damages. With discovery now complete, the record has become clear that Insurers are liable for Taylor's damages because they resulted from earth movement.

In response to the issues with the Press Pads, both Taylor and Insurers hired experts to determine what happened and how to respond. Though the expert reports disagreed on many points, there is no genuine dispute of fact that earth movement caused the damages here. Taylor hired Intertek PSI ("PSI") to investigate the soil conditions beneath the pads. (Decl. of Mark L. Johnson ("Johnson Decl."), Ex. 1 ("PSI Rep."), July 1, 2024, Docket No. 116.)[2] The PSI Report concluded based on soil samples that "the observed settlement is likely due to the softer soils at depth on site, and settlement should be anticipated for the machine pads, floor slab, and building foundations." (*Id.* at 10.)

Insurers hired their own experts, and the subtext of those reports is clear: Taylor should never have installed such sensitive machines where it did without more due diligence. But none of these reports deny that earth movement caused Taylor's damages. Terracon's report characterized the problem as "settlement issues" and observed that throughout the building, the evidence "suggests that deficient or variable densification of the sand fill soils placed for development of the building and floor slab subgrade was likely a contributing factor of the observed slab settlement." (Johnson Decl., Ex. 8 ("Terracon Rep.") at 3–4, July 1, 2024, Docket No. 116-7.) In its report, ED&T chastised poor planning by structural engineers but ultimately concluded that "[f]actors contributing to the floor

---

[2] Citations to all expert reports are to the reports' original pagination.

movement include variances in the soil compaction beneath the equipment pads and low-strength soils 40 to 60 feet beneath the building." (*Id.*, Ex. 9 at 6, July 1, 2024, Docket No. 116-8.)    Insurers' retained adjuster, Sedgwick Claims Management Services, Inc. ("Sedgwick"), then used the Terracon and ED&T reports to deny Taylor's claim.    Like ED&T, Sedgwick first pinpointed "the root cause of the floor movement" to be "a lack of consideration by the geotechnical and structural engineers for the Heidelberg allowable floor deflection limits," but then went on to repeat ED&T's language that "variances in the soil compaction beneath the equipment pads and low-strength soils 40 to 60 feet beneath the building" were factors contributing to the Press Pad failure. (*Id.*, Ex. 10 at 1–2., July 1, 2024, Docket No. 116-9.)

Despite Insurers' attempts to shift the blame to engineers who should have anticipated the problems that Taylor encountered when installing sensitive press pads on shifting soils, the Court finds there is no genuine dispute of material fact on liability. The Court previously held that even "[e]arth movement caused by faulty workmanship" is covered loss, regardless of whether "the faulty workmanship . . . is the proximate cause of the loss." *Taylor Corp.*, 2023 WL 4595708, at *8.    Here, earth movement caused Taylor's damages, and Insurers must cover those losses.

Therefore, the Court will grant Taylor's motion for summary judgment as to liability. What remains is detailing the contours of its damages.

B.     Limiting Coverage to Pad B

Insurers argue that if they must cover any of Taylor's losses, it is only for the cost of replacing one of the six Press Pads—because only Press Pad B suffered direct physical loss or damage when it physically cracked because of shifting earth. That Taylor then decided to rip out all six and reinstall them, say Insurers, is not enough to trigger coverage for the uninjured pads. The Court disagrees and will find that Insurers are liable for replacing all six pads.[3]

The Policy "covers all risks of direct physical loss or damage to Insured Property at Insured Location(s)." (Bartlow Decl., Ex. 52 ("Policy") at 15, July 1, 2024, Docket No. 122-21.)[4] Under Minnesota law,[5] "direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way." *Gen. Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 152 (Minn. Ct. App. 2001).

As the evidence now shows, earth movement was not isolated to Press Pad B, nor do Insurers offer evidence in rebuttal to create a genuine issue of fact. When the expert firms hired in this case investigated Taylor's claim, they did not limit their conclusions to

---

[3] Taylor moves for summary judgment on liability. But in briefing responding to Insurers' motion, Taylor suggests that the precise number of pads covered should be a question for a jury. The Court is satisfied, based on the record, that no genuine issue of fact remains here to waste a jury's time on deciding this question. Insurers are liable for the replacement of all six pads.

[4] Citations are to original pagination of the Policy.

[5] Parties do not appear to contest that Minnesota law applies.

Press Pad B.  (*See* PSI Rep. at 11 (investigating soil conditions and potential issues across the entire press pad area); Terracon Rep. at 3–4 (noting that a key problem was "variable densification of the sand fill soils" beneath the entire building, not just one press pad).) Other than mere statements to the contrary in their briefing, Insurers offer no evidence to rebut this claim.  That is not enough to survive summary judgment.  *Anderson*, 477 U.S. at 256 ("[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.").

Taking another swing, Insurers remind the Court that only Press Pad B actually cracked and point to unpublished and nonprecedential caselaw that suggests damage to part of a system does not trigger coverage to replace the whole.  *See Rest Assured, Inc. v. Am. Motorist Ins. Co.*, No. C9-98-2302, 1999 WL 431112, at *2 (Minn. Ct. App. June 29, 1999) (limiting coverage to replacement of only the 30 trusses that sustained physical damage while excluding coverage for replacement of additional 300 trusses).  But Insurers' focus on the physical cracking of Press Pad B is misplaced.  Cracking of the Press Pad is not what triggered coverage here; it was the earth movement beneath the building. As the evidence now shows, that earth movement was not isolated to Press Pad B.  The shifts in the soil injured all six Press Pads by rendering them inoperable, and the Insurers must now pay to replace them.

Accordingly, the Court will deny the Insurers' motion as to this point.  Because the Court is granting Taylor's motion for summary judgment on liability, this means that Insurers must cover replacement of all six Press Pads.

### C.    Like-Kind-and-Quality Replacements

Insurers next ask the Court to find that their liability for replacing the Press Pads is limited to doing so on a like-kind-and-quality basis.  The Court agrees.

The amount an insured can recover "is not the amount spent."  *Georgia-Pac. Corp. v. Allianz Ins. Co.*, 977 F.2d 459, 462 (8th Cir. 1992).  Instead, the Policy governs.  *Id.*  For like-kind-and-quality policies, the replacement need not be identical, but it must be reasonably similar to what existed before.  *Cedar Bluff Townhome Condo. Ass'n, Inc. v. Am. Fam. Mut. Ins. Co.*, 857 N.W.2d 290, 294 (Minn. 2014); *cf. Farmers Auto. Ins. Ass'n. v. Union Pac. Ry. Co.*, 756 N.W.2d 461, 471 (Wisc. Ct. App. 2008) (noting "like kind and quality" does not require "brick-by-brick, fixture-by-fixture, or window-by-window congruence").  An insured can upgrade the injured property to something better than it was before, but if they choose to do so, the insurer need only pay "what it otherwise would be required to pay had the insured not upgraded the property."  *Georgia-Pac.*, 977 F.2d at 461.

Here, the Valuation portion of the Policy limits coverage to the lesser of

> (1) The cost to repair, rebuild or replace the lost or damaged improvements and betterments with new materials of like kind and quality, whichever is less;

> (2) The actual expenditure incurred in repairing or replacing the lost or damaged improvements and betterments, whichever is less.

(Policy at 61.)  Taylor spent approximately $125,000 to design and pour the original press pads.  (Jackson Dep. at 26:7–13.)  When those failed, Taylor spent over $2 million to replace them, opting for pads that were eight inches thicker and supported by multiple deep micropiles resting on bedrock.  (*Id.* at 26:25–27:25.)

Taylor upgraded its Press Pads with structures that were far beyond a like-kind-and-quality basis.  It had the right to do so.  But Taylor does not have the right under the Policy to have the full multi-million-dollar upgrade reimbursed by Insurers.  No reasonable insured should believe that they could install a structure, get it insured, and then replace it with something nearly 20 times as expensive and still have it covered.

The Court will thus grant the Insurers' motion to the extent that Taylor is not entitled to the full reimbursement of its actual costs.  But the Court leaves to the jury to decide what a like-kind-and-quality replacement would cost, noting that the replacement need not be identical to the prior design.

### D. Protection & Preservation of Property Coverage

Insurers argue that Taylor is barred from seeking recovery under the Policy's Protection & Preservation of Property coverage, which could be triggered for the $120,000 that Taylor spent to remove the Heidelberg press from the pad and store it temporarily.

-14-

Taylor does not dispute this, and Insurers concede that if Taylor proves covered, unexcluded physical loss or damage to Press Pad B, the cost to remove and store the Heidelberg press may fall within the scope of the like-kind-and-repair of that pad. That is, Insurers concede that they may have to pay that $120,000 expense under a different Policy provision.

Because it is uncontested, the Court will grant the Insurers' motion to the extent that Taylor is not entitled to Protection and Preservation of Property coverage for its temporary storage of the Heidelberg press.

### E.    Time Element Loss

Insurers next request that Taylor's time element damages in this breach of contract action be limited to a theoretical period of liability of only eight weeks. Insurers' timeline comes from the roughly two months it would have taken Taylor to immediately replace the Press Pads on a like-kind-and-quality basis. Taylor disagrees, urging it is due damages for up to 18 months, which is the time it took to replace the equipment and make the building and equipment ready for operations.

Under the Policy, the Period of Liability runs from the date of physical loss or damage to the time "when with due diligence and dispatch the building and equipment could be: (a) repaired or replaced; and (b) made ready for operations; under the same or equivalent physical and operating conditions that existed immediately prior to such physical loss or damage." (Policy at 51–52.)

Insurers argue that had Taylor acted with due diligence and dispatch, the Fridley Facility could have returned to operations within two months. They base this conclusion on their own engineering expert's opinion that it would have taken Taylor two months, at most, to remove and replace the Press Pads with press pads of like kind and quality.

But Taylor counters that to make its facility "ready for operations," as described by the Policy, it needed far more than two months. Taylor's planned move into the Fridley Facility was allegedly delayed by over a year to properly investigate the problems, design an appropriate repair plan, effect repairs, and complete the move. Indeed, Taylor says, it had every incentive to get its facility repaired and operational as quickly as possible; there was no unreasonable delay.

Ultimately, this is a jury question. The Parties may argue to the jury how much time was reasonable for Taylor to assess the situation and rebuild the facility such that it would be ready for operations again. Therefore, the Court will deny the Insurers' motion as to limiting Taylor's damages to eight weeks.

### F.    Attorney's Fees

Finally, Insurers seek summary judgment on the issue of whether Taylor may seek attorney's fees in this breach-of-contract case.

Insurers rightly point out that under Minnesota law, attorney's fees may not be recovered in a breach-of-contract case unless authorized by a contract or statute. *Kvidera v. Rotation Eng'g & Mfg. Co.*, 705 N.W.2d 416, 424 (Minn. Ct. App. 2005) (citing *Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 53 (Minn. 1983)).

-16-

Taylor does not contest that it cannot seek attorney's fees for breach of contract under the Policy. However, it seeks to reserve the right to seek attorney's fees for responding to duplicative portions of Insurers' motion and as an equitable offset to Insurers' own intention to seek a reduction in damages based on the settlement that Taylor obtained through a related state action.

The Court will grant the Insurers' motion to the extent that Taylor may not seek attorney's fees under the Policy or based on its breach of contract claim.

### III.    INSURERS' MOTION TO EXCLUDE EXPERT TESTIMONY

In conjunction with its summary judgment motion, Insurers filed a *Daubert* motion to exclude the opinions and testimony of Taylor's primary damages expert, Mark Hosfield. Hosfield is a certified public accountant and certified management accountant. (2nd Decl. of Laura Bartlow, Ex. 2 at 1, July 1, 2024, Docket No. 137.) He often serves as an expert on breach of contract damages reports. (*Id.*) Hosfield's report came to three conclusions, which in their sum lead to a calculation of nearly $9 million in damages:

1. Taylor has suffered increased variable production costs of at least $5,621,164 during the period of delay associated with the press pad issue.

2. Taylor has been damaged in the amount of at least $1,063,023 in excess facilities costs and $87,708 in excess machine maintenance costs.

3. Taylor has been damaged in the amount of at least $2,188,074 in property damage costs related to fixing, removing, and reinstalling the press pads.

(*See id.* at 12.)

-17-

Insurers lodge two overarching objections to Hosfield's report: (1) that the report is irrelevant, unreliable, and confusing to the jury because it does not use the Policy to determine the damages, and (2) that Hosfield is not qualified to calculate damages under an insurance policy.  The Court will evaluate each issue in turn.

### A.    Failure to Use the Policy

Insurers' primary objection is that Hosfield's testimony is irrelevant because it calculates damages without reference to two key parts of the Policy: the Period of Liability and the Valuation clauses.

The Policy's Period of Liability for Time Element ends "when with due diligence and dispatch the building and equipment could be: (a) repaired or replaced; and (b) made ready for operations; under the same or equivalent physical and operating conditions that existed immediately prior to such physical loss or damage."  (Policy at 51–52.)

But as the Court discussed in its summary judgment analysis, the Parties are still at loggerheads over the length of the Period of Liability: Insurers argue Taylor could have replaced the pads within 2 months, and Hosfield's calculations use an 18-month delay. Because the Court is leaving the Period of Liability as an unsettled fact question for the jury, it will not exclude Hosfield's calculations for lack of relevancy.  Instead, Insurers may cross-examine Hosfield about his assumptions at trial and offer an alternative calculation of damages themselves.

Similarly, Insurers argue that Hosfield ignored the Valuation clause of the Policy by refusing to compare like-kind-and-quality replacements of the Press Pads.  As discussed,

the Court agrees with Insurers that Taylor may only recover the amount it would have paid for like-kind-and-quality replacements of its original Press Pads.  Therefore, Opinion 3 of Hosfield's Report, wherein he asserts that Taylor incurred $2,188,074 in costs related to upgrading the Press Pads, is no longer relevant and must be excluded.  Hosfield may amend this part of the report to estimate a like-kind-and-quality replacement and may offer such an opinion at trial.

### B.    Hosfield's Qualifications

Separately, Insurers object that Hosfield is not an expert in insurance contracts, and that his lack of expertise shows because of his unfamiliarity with time element losses and his inability to match the language of the Policy when calculating damages.  But Insurers' concerns are overblown.  As to the Period of Liability, Hosfield does not refuse to match the language of the Policy so much as he is simply operating under a different assumption about what that language means.  And overall, a person need not specifically be qualified in the narrow field of "insurance contract damages" to opine on damages more generally.  Indeed, as Taylor points out, Insurers' own damages expert is admittedly not an expert in this narrow field.

Overall, the Court will grant Insurers' Motion to Exclude Expert Testimony only to the extent that Hosfield may not testify as to the full cost of upgrading the Press Pads; in all other respects, the Court will deny the motion.

IV.    **TAYLOR'S MOTION TO EXCLUDE EXPERT TESTIMONY**

Taylor filed its own *Daubert* motion seeking to exclude the opinions of Insurers' rebuttal expert, Matthew Woodcock.  Woodcock has been providing forensic accounting services for over 35 years and often testifies as an expert in damages calculations.  (Decl. of Sybil L. Dunlop, Ex. 1 at 3, July 1, 2024, Docket No. 107.)  In particular, he has previously analyzed financial losses for at least three Taylor-owned printing businesses, as well as a dozen or more time element losses for companies that own and operate printing presses and provide related marketing services.  (*Id.*)

Woodcock's rebuttal report largely mirrors the Hosfield Report but comes to four conclusions:

1.    Taylor's computation of $5,621,164 in damages related to excess variable costs of production is erroneous, overstated and unsupported.

2.    Taylor's computation of $1,150,732 in damages related to excess facilities costs and machine maintenance costs is overstated and erroneous.

3.    Taylor's computation of $2,188,074 in damages related to costs of fixing, removing, and reinstalling the Press Pads is overstated.

4.    Assuming Insurers are liable for damages, the damages related to the direct physical loss or damage during the period of liability is $226,947, which includes extra expense, debris removal and replacement costs.

(*See id.* at 6.)

Taylor challenges each of these four opinions. Its overall argument is that Woodcock does not actually provide any of his own rebuttal damages calculations (other than in Opinion 4). Instead, Woodcock simply reads the Policy as excluding Taylor's ability to recover damages for the requested costs and thus opines that the damages Hosfield calculated are "overstated."

Although Taylor wants to pick off each opinion one by one, the opinions are better read holistically, as Opinions 1 through 3 criticize different parts of Hosfield's damages calculations, and then Opinion 4 counters with a damage calculation of Woodcock's own. Read together, there is enough to survive a *Daubert* challenge.

### A.    Opinion 1 – Excess Variable Costs of Production

Woodcock's Opinion 1 has two parts: the first section calls into question the "erroneous methodology" Hosfield used in projecting variable production costs during the year of delay; the second part analyzes the "policy issues" inherent in Hosfield's report and opines that the Period of Liability should have been only two months. (*Id.* at 23–28.) Taylor does not challenge the first part of the opinion, which it says is proper to present at trial to rebut its own expert's methods. But Taylor argues that the "policy issues" do not draw from Woodcock's expertise and instead are simply attempts to interpret the terms of the Policy or draw on others' expertise.

However, Taylor mischaracterizes this part of the Woodcock Report. While it is true that the Report claims that the Period of Liability should be two months, it goes much further than that by making four specific calculations:

1. $100,000 must be deducted from total damages based on the deductible in the Policy.

2. If the appropriate Period of Liability is twelve months, the extra expenses for increased variable production costs are $262,409.

3. There are no Material Cost inefficiencies in the first nine months following the incident and within twelve months the Material Cost inefficiencies are immaterial.

4. That there is no loss related to variable Labor Cost inefficiencies in the nine months following the incident, and variable Labor Cost inefficiencies are immaterial over eighteen months. Specifically, costs were $54,846 over eighteen months and $67,344 over twelve months, compared to nearly $10 million in annual Labor Costs for the company.

(*See id.* at 26–28.)

Unlike in the other opinions below, Woodcock seems willing to calculate damages beyond the narrow two-month window he maintains should be the Period of Liability. Given these quite specific computations, Taylor's objections lack merit. Because the Period of Liability is still an open question, the experts in this case will need to have multiple versions of the damages to present to the jury. This opinion is therefore relevant to the factfinder and will help the jury decide the case.

### B.     Opinion 2 – Excess Facility & Machine Maintenance Costs

Woodcock next critiques Hosfield's calculation of Excess Facilities Costs of $1,150,732 as overstated.  However, unlike in Opinion 1, Hosfield's calculation here does not attempt to recalculate excess facility costs.  Other than again pointing out that the Hosfield Report should have excluded $100,000 because of the deductible, the Woodcock Report simply says that the Period of Liability should have been two months and that the 18-month period overstates damages.

Standing alone, this opinion might not survive a *Daubert* motion, as it does not apply Woodcock's expertise to the facts of this case in a way that would help the jury.  But this opinion makes more sense when read in conjunction with Opinion 4, wherein Woodcock eventually concedes that he has calculated excess facility costs to be only $107,838 and excess machine maintenance costs to be $14,154 based on a 2-month Period of Liability.

Because it offers alternative damages calculations, this part of the Woodcock Report is reliable and relevant for the trier of fact.  The Court will therefore not exclude Woodcock's excess facility and machine maintenance costs testimony.

### C.     Opinion 3 – Costs Relating to Fixing, Removing, and Reinstalling Press Pads

Woodcock's third opinion critiques Hosfield's calculation of damages of $2,188,074 for replacing the Press Pads as overstated.  Here again, he offers no calculations of his own.  Instead, he regurgitates the arguments that Insurers raise in their summary judgment motions: that the Policy only allows for coverage to replace one of

the six pads, and that that replacement must be of like kind and quality. As above, Woodcock waits until Opinion 4 to offer his own calculation based on replacing one pad with like-kind-and-quality materials, eventually estimating that removal and replacement of only one Press Pad totals $204,955.

The Court's ruling on liability for all six Press Pads renders this opinion partially irrelevant, as Insurers are now definitively liable for the replacement of all six Press Pads on a like-kind-and-quality basis. Therefore, the Court will exclude Woodcock's testimony to the extent that it suggests liability for only one Press Pad and invites Woodcock to revise his testimony accordingly for trial.

### D.    Opinion 4 – Rebuttal Damages Calculations

Woodcock's final opinion offers his only true attempt to calculate damages. He estimates that, if Insurers are liable for anything, they are liable only for $226,947, which combines his prior three opinions. First, Woodcock says that Excess Variable Costs of Production are essentially zero because Taylor has not met its burden to show that these costs should be covered. Second, he says that Extra Expenses total $121,992, which includes excess facility costs of $107,838 and excess machine maintenance costs of $14,154, based on a 2-month Period of Liability. Third, he says that Removal and Replacement of only one Press Pad totals $204,955. Finally, he subtracts the $100,000 deductible.

Taylor complains that there is really no expertise applied here. Instead, Woodcock is simply taking the contract interpretation that was given to him by Insurers' lawyers and

applying them to Hosfield's calculations to shrink damages. Other than the first category of costs, Woodcock does not seem to attack the actual methodology of the calculations. Taylor argues Insurers do not need an expert to do that.

But Woodcock is offered as an expert witness to apply his accounting expertise to an alternative set of assumptions about damages; his rebuttal calculation of damages is based on reliable methods and will be helpful to a jury tasked with assembling a final damages calculation. The Court will therefore deny Taylor's motion, at least in part.

Overall, the Court will deny Taylor's *Daubert* motion, except to the extent that Woodcock opines that Insurers' liability is limited to replacing only one Press Pad. Should Woodcock revise that estimate, Insurers have shown that he is qualified, that his methods are reliable, and that his expertise will be helpful to the jury in determining damages in this case.

## CONCLUSION

On summary judgment, the Court will grant Taylor's motion, finding that there remains no genuine dispute of material fact that earth movement caused Taylor's six Press Pads to become damaged such that they needed to be replaced. Insurers must therefore cover Taylor's costs, and the question of liability is settled in favor of Taylor. As to Insurers' motion, the Court will grant it to the extent that Taylor may only recover the theoretical costs of replacing the Press Pads on a like-kind-and-quality basis, that Taylor is not entitled to Protection and Preservation of Property coverage for its temporary

storage of the Heidelberg press, and that Taylor is not entitled to attorney's fees in this action under the Policy. Otherwise, the Court will deny Insurers' motion.

On the motions to exclude expert testimony, the Court will grant Insurers' motion only to the extent that Opinion 3 of Hosfield's Report, wherein he asserts that Taylor incurred $2,188,074 in costs related to upgrading the Press Pads, is no longer relevant and must be excluded. The Court will grant Taylor's motion only to the extent that Woodcock may not testify that Insurers' liability is limited to replacing only one Press Pad. In all other respects, the Court denies both motions and permits both experts to revise their testimony based upon the contours of this Order.

With liability now settled, what remains for trial is damages. The jury must determine only the length of the Period of Liability and the extent of damages for (1) variable production costs, (2) excess facility and material costs, and (3) like-kind-and-quality replacement of the six Press Pads.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment on Liability [Docket No. 111] is **GRANTED**.

2. Defendants' Motions for Summary Judgment [Docket No. 119] are **GRANTED in part** and **DENIED in part** as follows:

    a. Defendants' Motions 1, 2, and 5 are **DENIED** in full;

     b. Defendants' Motion 3 is **DENIED** as to limiting liability to only one of the six press pads but **GRANTED** to limit coverage only to like-kind-and-quality replacement of Taylor's six press pads;

     c. Defendants' Motion 4 is **GRANTED** in full; and

     d. Defendants' Motion 6 is **GRANTED** to the extent that Taylor may not seek attorney's fees under the Policy for its breach of contract claim.

3. Plaintiff's Motion to Exclude Expert Testimony of Matthew Woodcock [Docket No. 102] is **GRANTED in part** and **DENIED in part** as follows:

     a. Woodcock may not testify that Defendants' liability is limited to replacing only one press pad;

     b. In all other respects, the motion is denied.

4. Defendants' Motion to Exclude Expert Testimony of Mark Hosfield [Docket No. 133] is **GRANTED in part** and **DENIED in part** as follows:

     a. Hosfield may not testify that Defendants are liable for Plaintiff's full actual costs in upgrading the Press Pads;

     b. In all other respects, the motion is denied.

This case will be placed on the Court's next trial calendar.


DATED:  March 10, 2025
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                              United States District Judge